**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **S2 19-CR-39 (JMF)** |
| | : | |
| **KENNY LIU,** | : | |
| **Defendant.** | : | |
| | : | |

**WACHTEL MISSRY LLP**

Marc Litt, Esq.
Jason L. Libou, Esq.
885 Second Ave., 47th Floor
New York, NY 10017
(212) 909-9500
mlitt@wmllp.com
jlibou@wmllp.com

*Attorneys for Defendant Kenny Liu*

# I. INTRODUCTION

Kenny Liu, by his undersigned counsel, respectfully submits this memorandum in aid of his sentencing, having agreed to plead guilty to the misdemeanor offense of supplementation of a federal salary in violation of 18 U.S.C. §§ 209 and 216(a)(1).

Mr. Liu, a 66-year-old naturalized citizen with cognitive and adaptive deficits and no prior convictions made mistakes during his 25-year career as a U.S. Postal Service mail carrier: over a period of five years, he accepted a total of approximately $5,200 in unsolicited small tips from the customers to whom he delivered a high volume of packages along his Chinatown route. Mr. Liu is deeply remorseful for those mistakes, for the pain that he has caused his family, and for the resources that the Government and Court have had to expend on his case. He recognizes that what he did was wrong, has accepted responsibility for those actions by agreeing to plead guilty, and has suffered emotionally and financially since his arrest on July 2, 2019. Although the stipulated U.S. Sentencing Guidelines range is 12 months' incarceration — the maximum permitted by the statute — we respectfully submit that imposition of a non-custodial sentence would achieve the purposes of sentencing set forth in 18 U.S.C. § 3553 in light of: the nature, facts and circumstances of the offense; Mr. Liu's personal characteristics; the sentences imposed on similarly situated defendants; the sentences imposed on his co-defendants; and, the severe COVID-related health risks that would be posed by incarceration.

# II. BACKGROUND AND PERSONAL HISTORY OF KENNY LIU

## A. Mr. Liu's Early Years and Family Life

Mr. Liu grew up in Kyauk Taw, Burma, where his parents ran a small business to support their five children, one of his grandmothers, and an aunt. Beginning in his early childhood, and throughout his life, Mr. Liu has needed extra help and assistance due to his cognitive and adaptive

deficits. Mr. Liu has received that support principally from his younger sister, Jenny. In childhood, she managed his allowance, helped him to navigate bullying classmates, and assisted him with his academic struggles. Later, she helped him find employment, buy a house, and maintain his family. Indeed, she still lived with him ten years into his marriage.

As a teenager, Mr. Liu and his sister, Jenny Liu, moved to Akyab, Burma, where they lived with the same grandmother and an aunt. Both Kyauk Taw and Akyab are in the Rakhine region, where a unique dialect of Burmese, "Rakhine" or "Arakanese," is spoken.

When Mr. Liu was a young boy living in Akyab, a fire swept through his neighborhood, and everybody started to flee the village as their houses were burning down.[1] Mr. Liu's sisters, Jenny and Michelle, were separated from him during the confusion, and he wound up searching for his sisters for several hours.[2] While the siblings were ultimately reunited the next day, it took more time to find their grandmother, their home was destroyed, and many neighbors died in the fire. His siblings report that Kenny was "deeply traumatized" by this incident and paralyzed by the fear that he had lost his family.

Mr. Liu left school at age 17, when he was halfway through repeating the eighth grade,[3] and left Burma for Macau in search of employment. While in Macau, he had factory jobs packing boxes and making sweaters until he immigrated to the United States in 1983.

### B. Mr. Liu's Life in the United States

Once in the United States, with the help of his family, Mr. Liu obtained jobs in factories, where he packed boxes for eleven years. In 1989, he became a naturalized citizen and Mr. Liu

[1] *See* Letter from Ping Liu, Jenny Liu, and Michelle Liu Chu to Judge Furman, dated Aug. 10, 2020, attached hereto as Exhibit E.
[2] *Id.*
[3] Mr. Liu had approximately three years of exposure to English during his schooling in Burma.

married his wife, Jasmine Liu ("Jasmine"). In 1994, again with the help of his family, he managed to obtain employment at the U.S. Postal Service, where he worked for 25 years.

The Lius have two adult children, Cynthia (28), and Calvin (26). The Lius were able to put their children through college at CUNY and UCLA, respectively, and have paid off the debt incurred in buying their house on Staten Island, which they purchased with the help of Jenny in 1998, and where they have lived together since. Mr. Liu took great pride raising his children and has been a supportive and loving father as evidenced by the family letters attached hereto.

### C.    Mr. Liu's Exemplary Career in Public Service as a Mail Carrier for USPS

From May 7, 1994 through July 2, 2019, when he was arrested, Mr. Liu was dedicated to his work as a mail carrier for the United States Postal Service (USPS). In 1994, his sister, Jenny, persuaded Mr. Liu to get his driver's license, which was necessary to obtain the mail carrier position, and subsequently helped him study for the written test using copies of prior exams. Jenny taught Mr. Liu how to memorize and look for key words to select appropriate answers to the multiple-choice questions. On his third attempt, he passed the exam. After Mr. Liu obtained his driver's license, his family strongly encouraged him to apply for work with USPS, where his brother, two sisters, and two brothers-in-law were already employed. Mr. Liu's brother provided a study guide for the exam and, again with his family's help, he studied using the same "one-word" method that he had used to pass the driver's license exam. After failing the USPS exam six times, Mr. Liu finally achieved a passing score; he was informed that his score was the third lowest of a large group of applicants.

Mr. Liu started working for the USPS as a Part Time Flexible City Carrier earning $10.47 per hour. For the first two months, Mr. Liu worked as a foot carrier; subsequently, he trained for two weeks on a delivery truck and for the remainder of his 25-year career delivered express mail

packages[4] along the same route to customers who lived and worked in a small segment of Chinatown. He became a salaried employee on March 2, 1996; as of his retirement, effective August 31, 2019, his annual salary was approximately $65,000.

Until his arrest, the sole blemish on Mr. Liu's otherwise exemplary employment record arose out of a misunderstanding in 2004, when he was administratively disciplined for removing and discarding address labels from 43 telephone books assigned to him for delivery.[5] Mr. Liu immediately accepted responsibility for his acts and admitted to removing the labels so that he could leave the books in building foyers instead of delivering them apartment-by-apartment.[6] As punishment, Mr. Liu was suspended for four weeks without pay.

According to his USPS supervisors, Kenny was hard-working and reliable. One of his supervisors, Gary Leong, who worked with and supervised Mr. Liu for a total of sixteen years, informed counsel that "Kenny was one of the hardest working and most reliable Postal employees that I have ever worked with or supervised. He worked like an ox, never took sick days, lost weeks of vacation time every year, and would often start early on his own." Siu Cheung, Mr. Liu's supervisor for more than a decade, told counsel that he was "one of the good guys, that Mr. Liu was never late, and he was often early to work, rarely took a sick day, and would offer to do additional work if he had time."

[4] Mr. Liu delivered express mail and non-express mail from domestic regions and foreign countries. These mail items often included large envelopes and boxes that weighed up to 60 pounds.

[5] Although Mr. Liu was initially charged with a violation of New York Penal Code 195.00, Official Misconduct, those charges were subsequently dismissed.

[6] Mr. Liu informed counsel that the residents of the buildings to whom the phone books were addressed were hostile, and that, in his experience, they did not want the telephone books which he was supposed to deliver door-to-door because they didn't fit in the addressees' mailboxes. He removed the labels to avoid lugging the books door-to-door and to avoid residents that he expected would either refuse to answer or respond with hostility. Because he thought it was improper to leave addressed mail out in the open foyers (where he planned to leave the books for any resident that wanted one), he removed and discarded the address labels.

Mr. Liu's exceptional performance was formally noted on several occasions. He received: a special commendation from the District Manager/Executive in Charge of the New York District for his "commitment to quality service and customer satisfaction" in the face of blizzard conditions on February 26, 2010; commendations for achieving perfect attendance during 2011 and 2015; a 25-year service pin on May 7, 2019; and, a Service Award Certificate from the Postmaster, Manhattan, New York District, commemorating Mr. Liu's 25 years of service, on August 31, 2019.[7]

Although Mr. Liu hadn't planned on retiring, his arrest caused so much stress and anxiety that he retired on August 31, 2019. In doing so, he lost one of the core foundations of his life.

**D. <u>Mr. Liu Has Significant Deficits in Cognitive and Adaptive Functioning</u>**

After struggling for several weeks to communicate successfully with Mr. Liu, no matter which languages were used (English, Cantonese, Burmese or Rakhine),[8] in October 2019, counsel engaged Dr. Jessica Pearson, a clinical and forensic psychologist who has faculty appointments in the Departments of Psychiatry at both Mount Sinai School of Medicine and New York University School of Medicine, and the Department of Psychology at New York University, to evaluate Mr. Liu's psychological and cognitive functioning. [redacted]

[7] Copies of the USPS Service Awards and Commendations given to Mr. Liu over the years are attached hereto as Exhibit A.

[8] Mr. Liu speaks four (4) languages with varying degrees of fluency. He is fluent in Rakhine, less so in Burmese, and even less proficient in Cantonese. He has difficulty understanding English (especially when spoken quickly or when complex grammar, or advanced vocabulary is used), and generally speaks in simple sentences and fragments. He is able to read Rakhine and Burmese at a basic level but is unable to read Cantonese. He has limited ability to read English.

[redacted]

【heavy redaction page — mostly blacked-out content with minimal visible text】

Indeed, the simple, stable life that Mr. Liu has led is entirely consistent with Dr. Pearson's findings. For decades, he has lived in one place, with one spouse, had one job serving one neighborhood in regular routine, and maintained few relationships beyond family. As all of his family members have confirmed, Mr. Liu has required help navigating the world since childhood, including help developing pattern recognition techniques that allowed him to pass the tests required to obtain citizenship, a driver's license, and USPS employment.

**E. <u>Mr. Liu's Physical Condition</u>**

In 2014, Mr. Liu had a stent implanted to treat coronary artery disease.[19] He subsequently underwent bilateral leg interventions in 2014 and 2015 to treat peripheral artery disease.[20] He currently suffers from hypertension, chronic back pain, high cholesterol, anxiety, loss of appetite, insomnia, nightmares, and has lost approximately 15 pounds from stress arising from his arrest and the charges in this case.[21] Mr. Liu's cardiologist has indicated that his multiple cardiac conditions place him at "high risk" were he to contract COVID-19.[22]

---

[18] *See* February 20, 2020 Supplemental Report of Dr. Pearson attached hereto as Ex. C. A copy of Dr. Pearson's curriculum vitae is attached hereto as Ex. D.
[19] *See* Aug. 26, 2020 Letter of Michael C. Liou, M.D. attached hereto as Ex. K.
[20] *Id*.
[21] *Id*.; Pearson Report, Ex. B, at 5.
[22] Ex. K.

### F. <u>Mr. Liu Has a Loving Family and Demonstrated History of Caring for Others</u>

From an early age, Mr. Liu exhibited a degree of compassion and caring that was, and continues to be, reflective of his character. He has a deep connection with his immediate family, siblings, and extended relatives who "have deep respect for him because of his kind and sincere nature. He is a person that means so much to so many people."[23]

According to Jasmine Liu, Kenny's wife of over 31 years, Mr. Liu is "an exceptional husband, father, brother, and son" who has always worked hard to provide for his family in every conceivable way; "from diligently working his long shifts at the post office to taking care of our kids and his mother. Kenny has always been a great father and a wonderful husband." She recounted his actions on September 11, 2001, when she was working on the 19th Floor of Tower One at the World Trade Center.[24] Mr. Liu, who was making deliveries on his mail route in Chinatown, witnessed the attack, but was unable to get in touch with Jasmine, and immediately started running toward the World Trade Center to find her. While most New Yorkers were fleeing the scene for safety, Kenny did the opposite: he selflessly put himself in harm's way in an effort to rescue Jasmine.[25]

In her letter to the Court, Jasmine Liu observed:

> Kenny is a truly kind man who is constantly looking for ways to help others. He never shies away from helping me around the house; with the recent storm in the Northeast, he just helped me replant my beloved tree that had fallen over in our front yard. I rely on Kenny both physically and emotionally. It is safe to say that without Kenny around, I would be lost.[26]

---

[23] Ex. E.
[24] *See* Letter from Jasmine Liu to Judge Furman, dated Aug. 10, 2020, attached hereto as Exhibit F.
[25] *Id.*
[26] *Id.*

Now that their children have grown up and moved out of the house, Mr. and Mrs. Liu are empty nesters who "have turned to each other for support and partnership."[27] Jasmine loves Mr. Liu "with all [her] heart" and eagerly hopes and prays that this matter can be resolved so that Kenny can go on to enjoy his retirement and spend time with her and their family.[28]

Mr. Liu is also a loving and devoted father. He is a "comfort figure" to his children and told them that he worked "a very hard and physically demanding job" so that they could "do well in school" and "afford a better lifestyle."[29] His daughter Cynthia recalls her father frequently "complaining about the growing pain in his back." She reported that his support has afforded her "the opportunity to go to college, travel, and experience the many things in life that he could not have done. . . . I am so thankful for my hardworking dad. Instead of experiencing life himself, he lives through us and so I strive to do him justice."[30] Even after returning from a long day of delivering heavy packages, he would lift up his daughter Cynthia each day when he got home.[31] She and her brother, Calvin, made a nightly ritual of stepping on Kenny's back to relieve the aches and pains in his muscles.[32]

Regarding Kenny's cognitive deficits and emotional state, Cynthia stated:

> I understand that [his] cognitive abilities affect his capabilities to make decisions autonomously. I can say that the impact of this case has traumatized him and has caused him to fall into a depression. He is no longer mentally and emotionally present when I am with him, as I know he is carrying heavy feelings of guilt and anxiety. He worries about his future, but more importantly, our future; the future of the children he has worked so hard for over the decades. My father is a wonderful man, and I hope to be able to see him smile again and return to him the meaningful experiences that he has worked so hard to have with his family.[33]

---

[27] *Id.*
[28] *Id.*
[29] *See* Letter from Cynthia Liu to Judge Furman, dated Aug. 10, 2020, attached hereto as Exhibit G.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

Mr. Liu's son, Calvin, also noted that his father "had to deal with his lack of cognitive abilities and rely on a lot of family members for assistance throughout life."[34] While Mr. Liu's cognitive deficits limited his ability to help Calvin with his academic work, he taught Calvin other things — like how to ride a bike — as well as the value of "resilience" and "persevering", especially in dealing with his struggles growing up as an Asian American in a predominantly white community in Staten Island. As Calvin put it, "My father, although [he] might not have been able to help me academically, was so influential in helping me build my character as an Asian American."[35] Calvin still draws on those lessons of "hard work and resilience" and says that he is "proud" to follow his father's example.[36]

In addition to his wife and children, Mr. Liu has been a pillar of support to his parents, in-laws and extended family. Kenny's siblings — Ping Liu, Jenny Liu, and Michelle Liu — describe him as "reliable, compassionate, humble", and "filial" and write of the commitment and exceptional care he has taken of their 95-year-old mother, who suffers from dementia.[37] As his siblings wrote to the Court:

> [Kenny] has always visited [his mother] often, not out of duty, but just simply due to the pure love her has for her. He always remembers to bring her favorite foods and will even spend the night to help watch over her, ready to ease her mind during her night terrors.[38]

Kenny also maintains the graves of his grandmother, father, aunt, and uncle.[39] Each year, Kenny volunteers at the Lighting Festival of Burma on Long Island where he assists with cleaning up and

[34] *See* Letter from Calvin Liu to Judge Furman, dated Aug. 10, 2020, attached hereto as Exhibit H.
[35] *Id.*
[36] *Id.*
[37] Ex. E.
[38] *Id.*
[39] *Id.*

setting up the festival for guests. Mr. Liu's siblings state that "[Kenny] has always been an integral member of the family and has never missed a family celebration."[40]

Mr. Liu's oldest sister, May Lee, echoes her siblings' statements and writes that "[e]verybody always loved and adored Kenny, and in fact he was my father's favorite."[41] She also worked at the USPS and often had unusual shifts, which made it difficult to spend time with her daughter, Melissa Lee Bruner. May Lee particularly appreciated how Mr. Liu stepped in and became a role model to Melissa:

> Not only did [Kenny] watch over [Melissa], but the values that he has instilled in her is what I am most proud of. Kenny has always taught my daughter the importance of hard work and the importance of being a good person. He was essential in my daughter's upbringing, and for that I am tremendously grateful for him.[42]

Indeed, Mr. Liu's extraordinary caring, empathy, and selflessness are showcased in the family's letters to the Court, which also demonstrate the strong foundation he provided to his immediate and extended family. As the family's letters and stories make clear, although Mr. Liu has led an uncomplicated life, it has been one of great care, hard work, selflessness, and compassion for others, making the safety and well-being of those around him his utmost priority.

## III. A NON-CUSTODIAL SENTENCE IS APPROPRIATE IN THIS CASE

Mr. Liu respectfully submits that consideration of the factors set forth in 18 U.S.C. § 3553 fully supports a non-custodial sentence.

Section 3553 requires the Court to impose a sentence that is "sufficient, but not greater than necessary," "to achieve the overarching sentencing purposes of 'retribution, deterrence, incapacitation, and rehabilitation.'" Rosales-Mireles v. United States, 138 S. Ct. 1897, 1903 (2018)

[40] *Id.*
[41] *See* Letter from May Lee to Judge Furman, dated Aug. 10, 2020, attached hereto as Exhibit I.
[42] *Id.*

(internal citations omitted). In doing so, the Court must weigh an "all-encompassing collection of information, advice, and discretion [that] yields 'an individualized assessment based on the facts presented.'" United States v. McIntosh, 33 F. Supp. 3d 448, 454 (S.D.N.Y. 2014) (citing Gall v. United States, 552 U.S. 38, 50 (2007)). Specifically, the Court must consider the need for the sentence: "[a] to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [b] to afford adequate deterrence to criminal conduct; [c] to protect the public from further crimes of the defendant; and [d] to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(1) – (2).

The Court must consider, among other things: "the nature and circumstances of the offense and the history and characteristics of the defendant," "the kinds of sentences available," and prevent "unwarranted sentencing disparities." 18 U.S.C. § 3553(a)(1), (3), (6). By applying these standards – "an individualized assessment, informed by the specific circumstances of the case and defendant" – the result is "a parsimonious sentence" that is sufficient, but not greater than necessary. McIntosh, 33 F. Supp. 3d at 454; 18 U.S.C. § 3553(a).

**A. 18 U.S.C. § 3553(a)(1): The Nature and Circumstances of Mr. Liu's Offense and the History and Characteristics of Mr. Liu**

Mr. Liu's agreement to plead guilty to a single count of the misdemeanor offense of supplementation of a federal salary in violation of 18 U.S.C. §§ 209 and 216(a)(1) represents an aberration in both his life and his nearly unblemished 25-year career as a public servant. Every federal crime is, of course, serious, and we do not seek to diminish the importance of the policy objectives that underlie this offense. Still, in the broad range of federal crimes, this non-violent and victimless offense, especially given the relatively small sum involved, lies toward the less serious end of the spectrum. As reflected in the Government's decision that this misdemeanor

charge appropriately accounted for his misconduct, it is important to note that Mr. Liu never solicited or demanded extra compensation from any of his customers, and the tips that he accepted were each generally not more than $1-2.

As described at length above, the vast majority of Mr. Liu's professional career has been dedicated to public service as a mail carrier for the USPS, during which he literally lived the credo of the USPS. Not only did he receive a commendation for his work during a blizzard, and certificates of perfect attendance, but he devoted several extra hours per week for which he did not seek overtime compensation to helping supervisors and colleagues get the mail sorted and delivered.

Any sentence should also take into account Mr. Liu's cognitive limitations and emotional health. Any term of incarceration would be devastating to Mr. Liu and his family. As described by family members, and as recounted in Dr. Pearson's report, his arrest, and the stress caused by the charges in this case, traumatized Mr. Liu to the point where he caused himself physical harm and had suicidal thoughts. We are deeply concerned that Mr. Liu simply doesn't have the intellectual and emotional strength necessary to survive in prison.

**B. 18 U.S.C. § 3553(a)(2), (7): Achieving the Purposes of Sentencing**

A sentence must be "sufficient, but not greater than necessary," to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). We submit that a non-custodial sentence would do so.

First, for the reasons stated above, a non-custodial sentence would reflect the seriousness of the offense and, given his agreement to forfeit the $5,200 in proceeds and his retirement in the wake of his arrest, is sufficient to promote respect for the law, provide just punishment, and afford adequate general deterrence.

Second, incarceration is not required to meet the goal of specific deterrence. Mr. Liu has complied with all of his bail conditions for more than a year and there is simply no evidence that a custodial sentence is necessary to deter him from violating the law in the future. He has learned a very hard lesson from this experience.

Third, as a 66-year-old with no drug or alcohol issues, and with significant cognitive limitations, there is no need for educational or vocational training or rehabilitation services, whether in prison or in the community.

Fourth, we are unaware of any victim's interest that would be vindicated by the incarceration of Mr. Liu.  Restitution is neither being sought by the Government nor is it necessary given the lack of any victim and the fact that Mr. Liu has agreed to forfeit the proceeds of his offense.

**C.      18 U.S.C. § 3553(a)(3): The Kinds of Sentences Available**

The statute does not require a custodial sentence and, given the advisory nature of the Guidelines following *Booker*, the Court has discretion to impose a non-custodial sentence.

**D.      18 U.S.C. § 3553(a)(6): Avoiding Unwarranted Sentencing Disparities**

We have identified only one case in the Southern District of New York in which a defendant was charged solely with a misdemeanor violation of 18 U.S.C. § 209: United States v. Kenneth Czumak, 14-cr-676 (JCF). From what can be gleaned from the docket, the defendant was an Information Technology Specialist who worked at a Veterans Affairs Medical Center. (ECF Dkt. No. 16, at 3.) He had a long history of service to the country in addition to his work at the VA, from which he resigned as a consequence of the offense, involved a Guidelines loss of approximately $40,000. (*Id.* at 2-3; ECF Dkt. No. 1 at 3.) The defendant suffered from post-traumatic stress disorder as well as other medical issues, and had at least one prior conviction. (*Id.* at 3-4.) Czumak was sentenced to a one-year period of probation and a fine of $250, and wasn't

subject to either restitution or an order of forfeiture. (ECF Dkt. No. 14.) Here, especially in light of Mr. Liu's agreement to forfeit the proceeds of his offense, and his lack of any prior convictions, sentencing him to a term of incarceration would create an unwarranted sentencing disparity from the only comparably situated defendant who has been sentenced in this District.

Likewise, defendants in other jurisdictions have received non-custodial sentences in cases involving both felony and misdemeanor violations of Section 209. *See*, *e.g*., *United States v. Raikes*, 05 Cr. 126 (RMU) (D.D.C. 2005) (Chief Consular Officer at a U.S. embassy sentenced to one year of probation and $3,000 fine for a felony violation of 18 U.S.C. § 209 that arose from acceptance of $11,900 in all-expense paid trips to Paris and Las Vegas) (ECF Dkt. Nos. 1, 6); *United States. v. Oberhardt*, 887 F.2d 790 (7th Cir. 1989) (affirming 2-year probation sentence for misdemeanor violation of Section 209 based on defendant's $200 payment to government official in exchange for an official document); *United States v. Tran*, 10 Cr. 553 (MEJ) (N.D. Cal. 2010) (subject of IRS audit sentenced to 6 months' probation and $2,100 fine for misdemeanor violation of Section 209) (Dkt. Nos. 1, 8). Accordingly, imposing a non-custodial sentence in this case would be in line with sentences given to similarly situated defendants in other Districts, and would not create an unwarranted sentencing disparity.

Sentencing Mr. Liu to a term of incarceration would create unwarranted disparities with the co-defendants who have already been sentenced in this case. Four of Mr. Liu's co-defendants have already pleaded guilty to conspiracy to traffic in contraband cigarettes. The Court has imposed sentences ranging from probation to one year and a day, based on applicable Guideline's ranges of up to fifty-seven (57) months, and restitution and forfeiture obligations of up to approximately $20 million:

| Defendant | Loss Amount (Guidelines) | Loss Amount (Restitution) | Judgment / Sentence |
|---|---|---|---|
| Zhurong Gao | $14,029,144.00 | $20,116,548.00 | 1 year and 1 day of imprisonment, followed by 3 years' supervised release. |
| Wo Kit Cheng | $3,621,325.50 | $5,062,938.04 | 6 months' imprisonment, followed by 3 years' supervised release. |
| Shao Jun Guo | $2,369,694.60 | $3,240,608.00 | 6 months imprisonment, followed by 3 years' supervised release. |
| Jian Jiang Feng | $2,028,487.50 | $2,726,043.82 | To be sentenced on 9/29/20. |
| Shui Ying Lin | $185,854.50 | $259,841.27 | 2 years' probation with special condition of 8 months' home confinement. |
| Kenny Liu | $5,200.00 | $0 | To be sentenced on 9/10/20. |

Sentencing Mr. Liu, who received only $5,200 in tips, to a custodial sentence would create a significant, unwarranted sentencing disparity when compared to the sentences the Court imposed on co-defendants who personally benefitted from their crimes to the tune of hundreds of thousands to tens of millions of dollars.

### E. <u>Mr. Liu's Physical Health and Vulnerability to COVID-19</u>

Finally, the Court should consider the health risks posed to Mr. Liu by incarceration in light of the COVID-19 pandemic and the special risks posed to prison populations.

In response to the pandemic, on March 26, 2020, the Attorney General of the United States wrote to the Director of the Bureau of Prisons to direct BOP to determine whether there were "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities."[43]

If incarcerated, Mr. Liu would be a non-violent, at-risk inmate, with minimal likelihood of recidivism, and who could safely serve a sentence, if any were required, in home confinement. His cardiac conditions place him at high risk were he to contract COVID-19, as indicated by his

[43] https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (last visited Aug. 20, 2020).

cardiologist and CDC guidance,[44] and his record of compliance with his bail conditions shows that he can be counted on to abide by any conditions imposed by the Court. Thus, if incarcerated, he would be a prime candidate for early release to home confinement.  In such circumstances, it would be unjust to imprison Mr. Liu. Although we don't believe that any kind of detention (home or otherwise) is warranted, we respectfully submit that, were the Court to disagree, any such conditions could be fulfilled by Mr. Liu in the far safer environment of the home he has shared with his wife (who works from that home) for decades. The catastrophic risk posed by incarceration in the midst of the pandemic, is not warranted by the nature and seriousness of Mr. Liu's offense and his personal characteristics, and a custodial sentence therefore would be contrary to the goals of sentencing set forth in Section 3553.[45]

---

[44] *See* CDC Guidance (updated Aug. 14, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html              (last           viewed           Aug.         26,         2020).

[45] *See Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *23 (D. Conn. May 12, 2020) ("even with the measures that the Warden has put in place, due to the impossibility of adequate social distancing, confinement at FCI Danbury—due to the very structure of the facility—continues to pose a grave risk to vulnerable inmates' health"). . "The stark reality is that 'avoiding exposure to COVID-19 is impossible for most detainees and inmates.'" *Durel B. v. Decker*, 2020 WL 1922140, at *2 (D.N.J. Apr. 21, 2020) (quoting *Cristian A.R. v. Thomas Decker*, Civ. No. 20-3600, 2020 WL 2092616, *2 (D.N.J. Apr. 12, 2020)).

Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together, and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings. Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout BOP facilities. According to the BOP, 114 inmates have died, and it has been reported that over 70% of those tested by the BOP may have the virus. *See* Fed. Bureau of Prisons, BOP: COVID-19 Update: https://www.bop.gov/coronavirus/ (last visited Aug. 20, 2020); Michael Balsamo, *Over 70% of Tested Inmates in Federal Prisons have COVID-19*, AP News (Apr. 29, 2020) ("new figures provided by the Bureau of Prisons show that out of 2,700 tests systemwide, nearly 2,000 have come back positive, strongly suggesting there are far more COVID-19 cases left uncovered"), available at https://bit.ly/2AiMjrF (last visited Aug. 26, 2020).

## IV. CONCLUSION

Given the nature of Mr. Liu's offense, his acceptance of responsibility and remorse for his actions, his personal history and characteristics, the high likelihood that he will never commit another offense, and the grave risk that prison would pose to his health given the difficulties controlling COVID-19 in correctional institutions, Mr. Liu respectfully requests that the Court impose a non-custodial sentence.

Dated: August 27, 2020
New York, New York

Respectfully submitted,
Wachtel Missry LLP

By: */s/ Marc Litt*

Marc Litt
Jason L. Libou
885 Second Ave., 47th Floor
New York, NY 10017
(212) 909-9500
mlitt@wmllp.com
jlibou@wmllp.com

*Attorneys for Defendant Kenny Liu*

**CERTIFICATE OF SERVICE**

I, Jason L. Libou, counsel for Kenny Liu, hereby certify that on August 27, 2020, I caused a true and correct copy of the foregoing Sentencing Memorandum of Kenny Liu to be served by the Court's electronic notification system upon:

Elizabeth A. Espinosa
Ryan B. Finkel
Assistant U.S. Attorneys
Office of the U.S. Attorney
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007

By: *_/s/ Jason L. Libou_*
Marc Litt
Jason L. Libou

Wachtel Missry LLP
885 Second Ave., 47th Floor
New York, NY 10017
(212) 909-9500
mlitt@wmllp.com
jlibou@wmllp.com

*Attorneys for Defendant Kenny Liu*